**In re BEVERLY HILLS FIRE LITIGATION.**

**This Document Relates to All Cases.**

**Civ. A. No. 77–79.**

United States District Court,
E.D. Kentucky.

May 13, 1986.

See also, 583 F.Supp. 1163.

Stanley M. Chesley (argued), White, Schneider, Byless & Chesley, Cincinnati, Ohio (Philip Taliaferro, III, Larry C. West, J. Gregory Wehrman, William D. Hillmann, G. Wayne Bridges, Covington, Ky., Thomas C. Spraul, Spraul & Reyering, Gene I. Mesh, Louis F. Gilligan and Lanny R. Holbrook, Keating, Muething & Klekamp, Walter Bortz, Reall, Hermanies & Bortz, Cincinnati, Ohio, E. Andre Busald, Florence, Ky., Richard M. Hunt, Dayton, Ohio, on brief; Fay E. Stilz, Cincinnati, Ohio, of

counsel), for plaintiff-appellants, cross-appellees Mary Elizabeth Kiser, et al.

Jacob K. Stein (argued), Paton & Seasongood, Cincinnati, Ohio, for Square D Co. and Slater Elec. Co.

Charles S. Cassis, Brown, Todd & Heyburn, Louisville, Ky., for Bryant Elec.

John David Cole, Cole, Harned & Broderick, Bowling Green, Ky., for Southwire and Triangle PWC.

Louis DeFalaise, Adams, Brooking & Stepner, Covington, Ky., for Columbia Cable & Elec. Corp.

Robert C. Ewald, Wyatt, Grafton & Sloss, Louisville, Ky., for Reynolds Metals.

James Wiles, Wiles, Doucher, Tressler & Van Buren, Columbus, Ohio, for American Insulated Wire, Leviton and Rhode Island Insulated Wire.

Lee O. Fitch, Miller, Searl & Fitch, Portsmouth, Ohio, for Hatfield Wire.

William V. Johnson, Johnson, Cusack & Bell, Ltd., Chicago, Ill., for Marmon Group, Inc.

William T. McCracken, Crabbe, Brown, Jones, Potts & Schmidt, Columbus, Ohio, for General Elec.

W. Andrew Patton, Kohnen & Kohnen, Cincinnati, Ohio, for John I. Paulding.

C. Alex Rose, Curtis, Rose & Parker, Louisville, Ky., for Pass & Seymour.

## MEMORANDUM OPINION

WILHOIT, District Judge.

### BACKGROUND

This opinion deals with a petition for attorneys fees and expenses of litigation relating to the worst disaster in the history of the Commonwealth of Kentucky—and that was the May 28, 1977, fire at the Beverly Hills Supper Club in Southgate, Kentucky.[1] The fire claimed 165 lives and injured another 116 employees and patrons. Hopefully, this opinion will constitute the closing chapter of that conflagration.

This tragedy brought about a flurry of lawsuits filed in the United States District Court for the Eastern District of Kentucky and in the Campbell County Circuit Court. The thrust of these complaints had the "pattern" of a double-barrel shotgun, i.e., everyone in sight was sued and the fingers of blame pointed in every direction. The scope of discovery and recovery theories, together with the number of defendants sued,[2] were of galaxial proportions.

Early on, the cases filed in this Court were before Hon. Carl B. Rubin.[3] His skillful organization and management of this litigation was most helpful to all the parties and to the Court in framing the issues that were tried before the undersigned in 1985. Moreover, his stewardship produced many large settlements.[4] There were other settlements in cases dealing with "groups" that were designated to proceed in the Campbell Circuit Court.[5] On February 25, 1982, the settlements, interest and other miscellaneous sources of income made up a "fund" of $25,216,536.00.

It should be noted that this collection of individual lawsuits were consolidated and given Rule 23 status because it was originally thought that there would be limited "funds" of only $3,000,000.00. This was the extent of the property and insurance coverage of the owners and operators of the supper club.

---

1. Southgate is a community within the Greater Cincinnati, Ohio metropolitan area.

2. Well over 1,000 individuals and firms were summoned.

3. Chief Judge, Southern District of Ohio, at Cincinnati.

4. These settlements included:

| | |
|---|---|
| (1) Shilling family (owners of Beverly Hills) | $2,415,000 |
| (2) Union Light, Heat and Power | 5,750,000 |
| (3) "Aluminum Wire Group" | 4,515,000 |
| (4) "PVC Group" | 1,995,000 |
| | $14,675,000 |

5. The State Court settlements totalled $5,265,-000.00.

In February, 1982, a distribution and allowance of fees was ordered and there was every good reason to believe that the distribution would eventually come to be known and referred to as the "final distribution." It should be remembered that the fourteen (14) non-settling "aluminum wire and device" defendants had won a stunning jury verdict returned at Covington in February, 1980. The verdict was stunning in the sense that the jury was out less than two hours.

The plaintiff class experienced a later set-back at the hands of a jury in Campbell Circuit Court at Newport, Kentucky but they won a partial victory with a jury against the PVC defendants. And this prompted a settlement of $1,995,000.00. At this point in time all the non-settling aluminum wire/device defendants seemed confident that their verdict before Judge Rubin would be affirmed.

But alas, the Lodge Hall of reversed United States District Judges always seems to be increasing its membership. Numbers are added daily. For on July 21, 1982, the United States Court of Appeals for the Sixth Circuit ordered the verdict set aside.[6] The Court by-passed several "meaty" issues and reversed for one of the most bizarre occurrences in anyone's memory.

It seems that one of the jurors had become irritated over publicity critical of the jury's unsympathetic verdict. He wrote an anonymous letter to the *Kentucky Enquirer* stating that his house had been wired with aluminum in 1969, and during the trial he had pulled several of the receptacles and found that the connections were very well secure indeed and observed no evidence of "creep." After the letter was published, a post-trial hearing revealed that this information had been shared with other jurors during the trial and was mentioned during deliberations. The Sixth Circuit held that this extraneous behavior was impermissible

and prejudicial to the plaintiffs and ordered a re-trial.

So then, that is where matters stood at the time the undersigned had been re-assigned the litigation. Judge Rubin retired from the case just weeks before the reversal. And the reassignment marks the beginning of the period for which fees and expenses are being sought.

The case against the fourteen (14) non-settling old technology aluminum wire/device manufacturers was tried in Ashland, Kentucky and commenced on April 30, 1985. It ended quite dramatically, on July 18, 1985. Along the way all defendants settled and an additional "fund" of $14,150,000.00 was realized. An additional $278,000.00, has been added through interest.

## I. APPLICATION OF PLCC FOR ATTORNEY'S FEES.

What, then, is to be the measure by which the Plaintiffs' Lead Counsel Committee (hereafter PLCC) should be compensated for their efforts?

In recent years the contingent fee based upon a percentage, usually one-third to one-half, has come under considerable scrutiny and criticism, and especially so in large class actions involving substantial injury claims.

The percentage methodology was condemned in *Lindy Brothers Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973), and also at 540 F.2d 102.[7] These decisions developed an alternative known as the *"Lindy lodestar."*

The lodestar approach simply requires the Court to reasonably find (1) the number of hours expended and (2) the usual hourly rate charged by the attorney involved and the product of the two constitutes the "lodestar."

Additionally, the Court may, in exceptional cases, enhance the lodestar by a

---

6. The opinion may be found at 695 F.2d 207. The Supreme Court denied certiorari on May 16, 1983. *See:* 461 U.S. 929, 103 S.Ct. 2090, 77 L.Ed.2d 300.

7. These cases are fondly referred to as *"Lindy I"* and *"Lindy II."*

"multiplier," so that the total fee will be commensurate with the true value of services rendered the class. Incidentally, a negative multiplier may be applied, but that will not be the case here.

Other Courts have followed this approach in the same or similar fashion. *See Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974); *Northcross v. Board of Education of Memphis City Schools,* 611 F.2d 624 (6th Cir.1979).

It must be emphasized that this litigation is merely a consolidation of a number of individual civil actions and is not a Rule 23 class action in its purest sense. Similarly, this is a *"fund"* type case and must be distinguished from the usual *"statutory"* type case that occupies most of the space in the books. There is but a sprinkling of "fund" cases among the written opinions. But this is easily understood. The Courts in the "statutory" case is levying fees against a defendant in the case. And they usually appeal even the most miserly awards.

We have considered a number of cases around the country that deal with the factors involved when a multiplier has been applied to the lodestar and by what amount.

In the case of *Arenson v. Board of Trade of the City of Chicago,* 372 F.Supp. 1349 (N.D.Ill.1974), the trial court awarded the plaintiffs' attorneys the lodestar rate multiplied by a factor of 4. The plaintiffs had brought a private antitrust action against the famed commodity exchange in Chicago, Illinois, alleging that their practice of fixing commission rates violated the Sherman Antitrust Act. The case was settled prior to trial and did not involve a "fund," but the settlement agreement provided for reasonable attorneys fees to be paid by the defendant. The multiplier to the lodestar rate was invoked mainly because of the numerous unsettled questions of law that plaintiffs faced and the remote chance for a favorable recovery. There was extensive trial preparation and the attorneys had incurred $14,486.25 as out-of-pocket expenses that were ordered reimbursed.

In *Municipal Authority of the Town of Bloomsburg v. Com'th of Pennsylvania,* 527 F.Supp. 982 (M.D.Pa.1981), an action was brought by a class of townships and municipalities alleging entitlement to federal sewage treatment project grants, the lodestar amount to $51,461.00. The Court found that the litigation was extremely complex and that there was a threshold improbability of success at trial because of an Eleventh Amendment problem. The trial court applied a lodestar multiplier of 4.5, and allowed recovery of "substantial" costs and expenses in the amount of $3,991.75. The case was settled without trial. Expenses for *paralegals* were allowed but were *excluded* from the application of the multiplier.

In a similar situation, a multiplier of 2 and 4 were applied to the lodestar in *Delaware Valley Citizens' Council for Clear Air v. Commonwealth of Pennsylvania,* 581 F.Supp. 1412 (E.D.Pa.1984), *aff'd.,* 762 F.2d 272 (3d Cir.1985). This action involved an effort to force the Commonwealth of Pennsylvania to comply with Federal standards for carbon monoxide and ozone levels in the Philadelphia and Pittsburgh metropolitan areas. The trial court applied a multiplier of 2 for some phases of the work of counsel and a multiplier of 4 for still another. The lodestar in the case amounted to $82,233.50, but after the application of the multipliers, a total fee of $209,813.00 was allowed. The Court also reimbursed the attorneys for $6,675.03 for litigation expenses.

The distinction between a "fund" and "statutory" fee case was brought into sharp focus by Justice Powell in *Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1549 n. 16, 79 L.E.2d 891 (1984). This case dealt with a state wide civil rights action for medicaid recipients. The plaintiff's attorneys had sought a multiplier of 1.5 to a lodestar of $79,312.00 as attorneys fees. The District Court approved the "bonus" request without much ado. And the Second Circuit affirmed it without much

more ado. In reversing the District Court's "bonus" which Justice Powell preferred to characterize as an "upward adjustment" and relying upon *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), it was held that under the facts of that particular case that the 1.5 multiplier was not justified. But the point to be made is found in a footnote wherein he wrote:

"Nor do we believe that the *number* of persons benefited is a consideration of significance in calculating fees under Section 1988. Unlike the calculation of attorneys fees under the "common fund doctrine," where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under Section 1988 reflects the amount of attorney time reasonably expended on the litigation...."

461 U.S. at 900 n. 16, 104 S.Ct. at 1549.

In the statutory fee type case, a multiplier of approximately 1.5 to the lodestar in a civil rights action that was settled less than nine months after it was filed has been held *not* to be justified. *Hall v. Borough of Roselle*, 747 F.2d 838 (3d Cir.1984).

In the case *In Re: Cenco, Inc. Securities Litigation*, 519 F.Supp. 322 (N.D.Ill.1981), four law firms collaborated in a securities action involving a manipulation of securities inventory and the altering of sales figures as a part of a plan to falsify the defendant's financial position. The case settled before trial for $3.5 million dollars. The Court noted that there would have been no settlement but for the painstaking trial preparation and that counsel had been faced with a case of enormous magnitude and complexity with substantial barriers to recovery. This case also involved new and unsettled questions of law relating to damages, contribution and accountant liability. The law firm that had assumed a major responsibility for the case and handled 75% of the work was awarded a lodestar multiplied by a factor of 4. The Court also awarded this firm $41,300.00 for paralegals and $24,783.32 litigation expenses. The other law firms in the case were awarded a fee with a multiplier of 2, but no *multiplier* was used for expenses for paralegals.

We have taken into account a number of factors that have all been found to run through the decisions bearing on the question. One case, *Johnson v. Georgia Highway Express, Inc.*, supra, is widely cited as an analytical study of the problem and lists as many as 12 factors that might be considered. Of those we have taken the facts of this case and used the following factors as an overlay to reach a solution:

(1) the time and labor required;
(2) the novelty and difficulty of the questions involved;
(3) the skill requisite to perform the legal service properly;
(4) the preclusion of other employment by the attorney due to acceptance of the case;
(5) the customary fee;
(6) the amount involved and the results obtained;
(7) the experience, reputation, and ability of the attorneys;
(8) awards in similar cases.

*Johnson*, 488 F.2d at 717–19.

## FACTORS JUSTIFYING LODESTAR MULTIPLIER

The factors set out above actually overlap and to treat them separately would burden this opinion with unnecessary repetition. A brief survey of the past few years should adequately demonstrate each factor in lieu of eight separate chapters. Quite simply, the Court finds that a multiplier should be applied to the lodestar in this case.

### 1. COMPLEX ISSUES—RECOVERY QUESTIONABLE

In the first place this case was complex. New ground was being plowed: making an ultimate recovery was highly questionable.

#### (a) "NO ACTION" STATUTE

The defendants contended before the first trial that the action was barred by a five (5) year "no action statute." KRS 413.135. This act provides:

No action to recover damages, whether based upon contract or sounding in tort,

resulting from or arising out of any deficiency in the design, planning, supervision, inspection or construction of any improvement to real property ... arising out of such deficiency ... shall be brought against any person performing or furnishing the design, planning, supervision, inspection or construction of any such improvement after the expiration of five (5) years following the substantial completion of such improvement.

The Court dealt with the question and held that the statute was enacted to protect architects and builders and did not extend to product manufacturers such as the defendants.

The Sixth Circuit, expressing an "educated guess," felt that the Kentucky Courts would hold that the statute extended to these defendants but that if it did so this might well be violative of Secs. 14, 54 and 241 of the Kentucky Constitution. *In re Beverly Hills Fire Litigation*, 695 F.2d 207, 224 (6th Cir.1982), *cert. denied*, 461 U.S. 929, 103 S.Ct. 2090, 77 L.Ed.2d 300 (1983). But this Constitutional inquiry was referred back to the District Court. *Id.*, at 227.

With the January 1, 1984, amendment to CR 76.37, the Kentucky Supreme Court permitted this Court, for the first time, to certify determinative questions of law for their consideration. And this was promptly done on January 4, 1984. *In re: Beverly Hills Fire Litigation* 583 F.Supp. 1163 (E.D.Ky.1984). We dutifully made the *constitutional* inquiry.

After briefing and oral arguments, the Supreme Court of Kentucky answered without delay. On May 31, 1984, it held that there was no constitutional question to answer, *i.e.*, that KRS 413.135, was applicable only to architects and builders and manufacturers and materialmen (such as these defendants) were not included within its

scope. *In Re: Beverly Hills Litigation*, 672 S.W.2d 922 (Ky.1984).

There was a clever dissent filed by Justice Vance who was joined by Justice Stephenson. It focused on a problem that shadowed the very last settlement.

The defendants argued that for the purposes of this case, the Sixth Circuit had held, (1) that the "no action" statute did indeed extend to include these defendant manufacturers, and (2) that a recent Kentucky decision [8] answered the constitutional question in the negative, and the Sixth Circuit's prior decision was the "law of the case" notwithstanding the Kentucky Supreme Court. The PLCC argued, and this Court persuaded, that the Kentucky decision would be dispositive. But the defense would never concede the point.

### (b) BIFURCATION

The difficult task of the PLCC was punctuated by questions that were left unanswered by the Sixth Circuit.

There was, in essence, a "tri-furcation" of issues at the first trial: (1) causation in fact, (2) concert of activity, and (3) damages, if need be. The "causation" issue was tried *separately* and *first.* The jury's verdict for the defendants demonstrated the wisdom of that decision. Only twenty-two (22) trial days were required for the jury to determine that old technology aluminum wire/device was not a substantial cause of the fire, and their verdict made the remaining issues moot.

The trial of the *causation* issue alone made a virtual mountain of documents inadmissible. They were irrelevant. They pertained to the *"concert"* issue and, more precisely, addressed *what each* of the defendants knew and *when* did they know it.

The Sixth Circuit did not reverse on the bifurcation issue. But it should be mentioned that the Judge Engel's opinion contained a subtle suggestion that a trial of both issues might be the thing to do.[9]

---

**8.** *Carney v. Moody,* 646 S.W.2d 40 (Ky.1982).

**9.** "The trial judge on remand *may* decide not to isolate *causation* from *liability.* In that case, the evidence could in the trial court's discretion be offered against some defendants with an appro-

priate limiting instruction. See Fed.R.Evid. 105. *If* the case is again bifurcated, it again will be within the trial judge's discretion whether and under what circumstances to admit the documents. Although we see the dilemma caused

Both issues of causation in fact and concert of action were ordered to be tried together. These issues were again bifurcated from the damages issue.

The jury consisted of a panel of six (6) jurors with six (6) alternates. The causation in fact issue was, over strenuous objection of the PLCC, argued *separately* and *first.* On July 15, 1985, the jury returned a verdict for the plaintiff class within one hour. Arguments on concert were held on July 18, 1985, and just before the Court charged the jury, the one remaining defendant agreed to contribute an additional $10,000,000.00, and the trial ended then and there.

### (c) THEORIES OF RECOVERY

Whereas the Sixth Circuit opinion was more or less dispositive on the issue of whether there was sufficient evidence for the case to go to the jury on the limited question of whether old technology aluminum wiring and devices was a substantial cause of the fire; the troublesome question was whether the plaintiff could go to the jury on the issue of the concert of action of the fourteen (14) non-settling aluminum wire and device manufacturers. How could they be connected with the fire? For you see the "unreasonably dangerous" product was consumed by the fire, and the true identity of the manufacturer could not be ascertained. This was indeed a formidable obstacle to recovery.

The PLCC argued three theories to recovery: (1) enterprise liability, (2) alternative liability, and (3) concert of action.

These issues were met head-on just before the first trial by Judge Rubin's Order # 215 which was entered on November 14, 1979.

(1) The *enterprise* or industry-wide liability has been recognized in several jurisdictions and imposes joint liability within an entire industry when the injury-causing product and its manufacturer cannot be identified. The Kentucky Courts had not recognized

the theory, and we are unaware that the question has ever arisen before.

(2) Judge Rubin also took an "educated guess" and held that the theory would not be recognized and granted summary judgment.

The above "guess" was probably conceived when the *alternative* liability theory was considered. The theory deals with situations where joint and several liability has attached to defendants whose particular products cannot be directly linked to the injury. This theory of recovery shifts the burden of proving causation to the several defendants. This notion was expressly rejected in Kentucky in *Cox v. Cooper,* 510 S.W.2d 530, 534 (Ky.1974). *See also Bradford v. Sagraves,* 556 S.W.2d 166 (Ky.App. 1977). Again, summary judgment entered disposing of this count in the complaint.

(3) Motion for summary judgment was denied as to the *concert of action* theory. Kentucky had recognized the concert of action theory, in totally different fact situations, and had imposed joint liability, on several defendants (a) when their actions violated some legal standard of care, which was, in this particular case the provisions of *Restatement of Torts (2d) § 402A;* (b) when *one* of the group acted in such a way so as to substantially bring about harm; and (c) when the defendants in the group participated by their concerted activity to bring about that harm. *See Murphy v. Taxicabs of Louisville, Inc.,* 330 S.W.2d 395 (Ky.1959); *Davenport's Adm'x v. Crummies Creek Coal Co.,* 299 Ky. 79, 184 S.W.2d 887 (1945).

The plaintiffs faced a number of evidentiary problems with regard to their concert of action theory of recovery.

First of all, there were not any "moles" (witnesses) to come forward and diagram the alleged conspiracy for the Court and jury. It had to be done with boxes of documents and live testimony from offi-

---

by these exhibits as one argument working against the employment of bifurcation here, it does not constitute a basis for denying it altogether, *if* in the *discretion* of the trial judge it

remains the most efficient method of managing this complex litigation on remand." *Beverly Hills,* 695 F.2d at 218. (Emphasis added).

cers, employees and former employees of the defendants. From the standpoint of trial tactics, this position placed the PLCC at a distinct disadvantage. Hostile or reluctant witnesses can usually disrupt the flow or pace of presentation. This type of situation can be most unsatisfactory to counsel. But the PLCC handled it with great skill.

Secondly, concert of action could not be established by a mere showing of (1) parallel activity and (2) actions that were merely independent adherence to an industry-wide safety standard.

From literally thousands of documents, the PLCC demonstrated considerable skill with their selection and presentation of several hundred of them that were eventually published to the jury. Without further burdening this opinion, suffice it to say that the document presentation got the plaintiff class to the jury.

Had the Beverly Hills trial litigation eventually entered the damage phase against even a single remaining defendant, the parties (and the Court) would have been faced with the awesome responsibility of apportioning damages among *all* of the defendants. Kentucky law contains "a long-standing rule that although [the defendants'] liability to the injured party may be joint and several, as between themselves the burden should be apportioned according to their comparative culpability." *Orr v. Coleman*, 455 S.W.2d 59, 61 (Ky.1970). Even if one or more of multiple defendants enter a settlement with the plaintiff, a jury must nevertheless "fix the proportionate share of the nonsettling tortfeasor's liability on the basis of his contribution to the causation." *Id.*

Such an attempt to apportion liability in the Beverly Hills case would have resulted in a battle of epic proportions. The number of defendants, combined with the number of causative factors, would have required years of trial time to sort out relative culpability. This would, of course, have reduced the eventual class recovery by a substantial amount of money.

The Court also notes that a number of complex issues would have emerged, many of which have not been resolved under Kentucky law. How, for example, could the jury have determined the comparative culpability of the wire and device defendants who were alleged to have entered into the concert of action? Would this have been determined by how many meetings they attended, or letters or reports written? Many of the defendants, the smaller hitters, were heard to argue that culpability would have been determined by "market share."

These questions highlight the value of the settlements to the class. Lead counsel was most wise in recognizing these problems and used great skill in the methodology employed to negotiate these agreements.

## 2. LENGTHY TRIAL—SKILL REQUIRED

The actual trial time consisted of a four-day final pretrial conference from April 22–24 and 29, 1985. The trial took 37 days and spanned 11 weeks.

The site of the trial was at Ashland, Kentucky, about 150 miles up the Ohio River from Cincinnati, Ohio, and Southgate, Kentucky. The attorneys were required to be away from their homes during these times.

The PLCC trial team was Stanley M. Chesley and Faye Stilz of the firm of Waite, Schneider, Bayless and Chesley, Cincinnati, Ohio; William Hillman, Covington, Kentucky; and Thomas C. Spraul, of Spraul, Regering, Cissel and Cronin, Cincinnati, Ohio. The Chesley firm also provided one administrative assistant during the entire trial.

Another original member of the lead counsel team was Louis F. Gilligan of Keating, Muething and Klekamp, Cincinnati, Ohio. Mr. Gilligan actively participated in the first trial held in Covington in the winter of 1979–1980, and participated in some of the pre-trial proceedings but did not appear in the trial at Ashland.

The fourteen (14) defendants were well represented. On the opening day of trial, approximately 25 lawyers were provided seating at counsel tables inside the bar. The Court also observed the comings and goings of an adequate number of secretaries, runners and paralegals. The PLCC faced the outstanding lawyers in leading firms from Louisville, Kentucky, Cincinnati and Columbus, Ohio and Chicago.

The quality of life enjoyed by members of the PLCC suffered during the trial. It was a "documents" trial for the most part. The Court required the PLCC to have their document lists marshalled for each witness and on a daily basis with copies to defense counsel and the Court.

The PLCC operated out of a 40′ × 40′ inside room on the second floor of the Courthouse. This room ordinarily would be quite sufficient, but it was literally stacked with boxes of documents, exhibits, desks, and work tables complete with a grimy-looking hot plate and coffee pot. This was the scene for all of the after Court hours that were always required.

Mr. Chesley and his firm spent substantial time and money on this case. Their time records made up about 71.7% of the total time spent by the PLCC. When usual hourly rates are applied, this figure reduces to 63.4% of the total "lodestar."

At the trial, Mr. Chesley took the lead. He was either delegated, or assumed, 80–90% of the interrogation/cross examination of witnesses. He usually argued motions at the pre-trial stages and at bench conferences during trial. If news accounts were faithful reports, he argued the "no action" issue before the Kentucky Supreme Court. Clearly, he put his time, money and professional reputation [10] on the line.

Ms. Stilz is a member of the Chesley firm and logged 408 or 19% more hours than did Mr. Chesley. She was present at all of the pre-trial and trial proceedings. Although she did not usually orally address the Court, she was observed to be in charge of

"oversight" and documents coordination. The Court cannot state what impact she may have had in the promulgation of strategy or formulaties of issues, but it was obvious that she played an integral part on the team.

Mr. William D. Hillman is an experienced trial attorney in Covington. He actively participated in the trial. He was present at the entire trial and argued orally before the Court, at bench conferences, as well as interrogation and cross-examination of witnesses. He demonstrated an intimate knowledge of every detail of the case and especially the causation issue. He also demonstrated a command of the exhibits.

Mr. Spraul is another experienced trial lawyer in Cincinnati, Ohio, and enjoys an "av" rating in *Martindale-Hubbell.* The record reveals that he was present at most every day of the trial. Although Mr. Spraul did not interrogate or cross-examine any witnesses, still, he argued at the bench and was observed by the Court to be participating in PLCC consultations that would have involved strategy, tactics or settlement offers. Because of his skill, reputation, and obvious contributions to the PLCC, his "lodestar" should have a multiplier.

Mr. Gilligan participated in the first trial but did not appear at the second one last year in Ashland. He did, however, appear at pre-trial hearings and participated in discovery and conferences. His services have been of great value to the class as a whole, and it is for this reason that he should be awarded a fee for the actual time spent on the case at his usual hourly rate. And his "lodestar" should be subject to a multiplier because of his exceptional contributions when he did make an appearance.

After consideration of all fee requests and the Court's first hand knowledge of the claimed expenditures of time of counsel, finds that there is no evidence that these time claims have been inflated in any way. Moreover, the Court has had consid-

---

10. Mr. Chesley has been involved in many other important cases of national interest including (1) Agent Orange, (2) Bhopal, India disaster, (3) Bendectin, (4) Dalkon Shield, (5) Asbestos Litigation, and (6) Love Canal.

erable exposure and has acquired knowledge of reasonable hourly rates charged by the attorneys involved in this litigation, and while we have not endeavored to set-out an hourly rate breakdown for each of the four years involved, we believe that a fair average hourly rate is justified as hereinafter set out.

■ Finally, and for reasons hereinabove stated, the Court has analyzed the work of the attorneys working as the PLCC and believes that multipliers to the "lodestar" (hours × hourly rate) is not only justified by the circumstances of this case but is mandatory in light of the factors we have hereinabove discussed. The findings of the Court as to the hours to be allowed, the hourly rates and the lodestar multiplier, wherever applicable, and the total fees to be allowed are as follows:

|  | HOURS | RATE | MULTIPLIER | TOTAL |
|---|---|---|---|---|
| **ATTORNEYS** | | | | |
| (1) Stanley M. Chesley | 2,144.50 | $175.00 | 5.0 | $1,876,437.50 |
| Fay E. Stilz | 2,552.50 | 125.00 | 2.5 | 797,656.25 |
| Phillip B. Allen | 206.75 | 125.00 | 1.0 | 25,843.75 |
| D. Arthur Rabourn | 78.75 | 100.00 | 1.0 | 7,875.00 |
| Kenneth G. Hawley | 52.50 | 100.00 | 1.0 | 5,250.00 |
| Troy W. Skeens, Jr. | 16.00 | 100.00 | 1.0 | 1,600.00 |
| Matt C. Midei | 71.75 | 75.00 | 1.0 | 5,381.25 |
| Neil J. Roth | 23.75 | 75.00 | 1.0 | 1,781.25 |
| Samuel Pietrandrea | 53.25 | 75.00 | 1.0 | 3,993.75 |
| Law Clerks (7) | 852.0 | 40.00 | 1.0 | 34,080.00 |
| Paralegals (2) | 126.75 | 40.00 | 1.0 | 5,070.00 |
| Administrative Assistants (2) | 1,280.00 | 30.00 | 1.0 | 38,400.00 |
| TOTAL | 7,458.50 | | | $2,803,368.75 |
| (2) William D. Hillman | 1,834.75 | 150.00 | 3.5 | $ 963,243.75 |
| (3) Thomas C. Spraul | 1,015.25 | 160.00 | 2.0 | $ 324,880.00 |
| (4) Louis F. Gilligan | 109.08 | 175.00 | 1.5 | $ 28,633.50 |
| Paralegals | 60.00 | 30.00 | 1.0 | 1,800.00 |
| | | | | $ 30,433.50 |
| | | | GRAND TOTAL | $4,121,926.00 |

## FEES FOR REFERRING ATTORNEYS

Earlier consideration was given to fee requests made by attorneys representing individual plaintiffs that had not been appointed to serve on the Plaintiffs' Lead Counsel Committee (PLCC). Most, if not all, had probably agreed to represent these plaintiffs with a contingency type fee arrangement—and in writing.

There had been concern of many of these attorneys that misunderstandings might arise with their clients as to what fee would be appropriate in light of substantial fees awarded to the PLCC.

Many of these attorneys were also fearful that whatever fee they might charge would come into conflict with at least two canons of our Code of Professional Responsibility. Canons DR 2–106; DR 2–107(A)(2), (3). These canons speak to the admonition that attorneys should charge fees that are reasonable and such fees should be a reflection of such things as the degree of responsibility undertaken, the amount of work performed, and the results achieved for their clients.

■ Apparently the concerns of these attorneys and their clients were considered by this Court's Order #396, dated February 18, 1982. The problem was reviewed in light of the applicable Kentucky law, and

the thrust of that Order permitted the non-PLCC attorneys to charge their clients a sum equal to 5% of their net recoveries, notwithstanding their contingent fee agreements for larger percentages.

The 5% fee set by the Court was reached after a careful review of this litigation up to that point. Apparently all of the attorneys and parties affected by that Order were satisfied, because no appeal was taken from it. It is now the law of the case. *Kori Corporation v. Wilco Marsh Buggies and Draglines*, 761 F.2d 649 (Fed.Cir. 1985); *Westbrook v. Zant*, 743 F.2d 764 (11th Cir.1984).

In a very real sense these attorneys have continued to provide valuable services to their clients and to the PLCC. These are the attorneys that have answered the many "... when will I get my money?" telephone calls, the personal conferences at their offices, homes, as well as inquiries on the street. This has been most exasperating to many people because this complex litigation has spanned nearly a decade. The ordinary citizen simply cannot understand why it would take so long to wind these matters up. We are confident that many times these attorneys felt that they had lost credibility with their clients. They have been required to administer files and they stood ready, willing and able to actively develop their clients' damage claims had that eventually ever become necessary.

Accordingly, the Court finds that all attorneys, not members of the PLCC, may charge their clients a fee not to exceed a sum equal to 6.3%[11] of the net final distribution payable to the individual plaintiffs and the Clerk is directed to include the name of these attorneys on all checks or drafts that will be issued as and for the final distribution to class members.

The Court further finds that attorneys who participated on the PLCC may likewise charge their clients a fee not to exceed a sum equal to 6.3% of the net final distribu-

tion over and above fees that have been allowed for their work as lead counsel. For after all, the Court sees no good reason why clients of PLCC members should be favored to the extent of 6.3% and be required only to incur attorneys fees as hereinabove allowed by the Court herein. In this way all class members would bear an equal burden, on a pro rata basis, for fees that have been allowed.

## II. APPLICATION OF PLCC FOR REIMBURSEMENT OF EXPENSES

The PLCC also seeks reimbursement of necessary expenses of litigation. On September 26, 1985, the Court conducted a hearing on the plaintiffs' application for expenses and later referred the application to the United States Magistrate Joseph M. Hood who performed an audit.

On December 5, 1985, Magistrate Hood filed his comprehensive report and recommendation, which recommends an award of $302,946.48 for the expenses. The Magistrate organized his report using the same categories of expenses as the PLCC had used in its application. In response to the report and recommendation, the PLCC on December 13, 1985, filed its motion for reconsideration of the report and recommendation; this motion is organized with the same categories and headings and supplements the record with documentation for some claimed expenses which the Magistrate recommended disallowing for the PLCC's failure to adequately document during its initial application for expenses. The Court finds it necessary to address the report and recommendation and the PLCC's motion for reconsideration by employing the same organizational categories and headings.

### (1) CATEGORY A

In Category A, which concerns the Beverly Hills Fire Litigation Expense Account, the PLCC claimed $259,037.14; the Magistrate, however, recommended allowing only $233,664.44, which were the documented

---

**11.** The 6.3% needs a word of explanation. It is felt that the percentage to the referring attorneys should be set at 7%. But, the proceeds of the final distribution includes funds that have already been considered for fees and this amounts to approximately 10% of the proceeds to be distributed. Accordingly, the 7% figure, reduced by 10% becomes 6.3%.

expenses as of December 5, 1985. In only four of the eleven subheadings in Category A did the Magistrate recommend denial of expenses:

| | Heading | | Claimed | Documented |
|---|---|---|---|---|
| II. | Court Reporters | | $ 10,860.00 | $ 11,640.50 |
| III. | Lodging | | 25,029.70 | 0.00 |
| VIII. | Out-of-Pocket | | 3,619.20 [12] | 1,920.54 |
| XI. | Unpaid Expenses | | 101,821.72 | 101,781.74 |
| | | TOTAL: | $141,330.62 | $115,342.28 |

### Court Reporters' Expenses

The PLCC's motion for consideration does not mention the heading for court reporters' expenses; thus, the $11,640.50 documented, which the Magistrate says reflects an invoice for $780.50 from Carol Spier which the PLCC inadvertently failed to include, should be allowed as the Magistrate recommended.

### (2) Lodging

Much of the PLCC's motion for reconsideration concerns the Magistrate's recommended denial of $25,029.70 in lodging expenses incurred at three hotels. The Magistrate noted that the Rodeway Inn, Southpoint, Ohio, bills have no breakdown and that the folios, though mentioned, were not attached, and that the bills reflect an overpayment of $2,000.00 by the PLCC. Additionally, the Magistrate stated that the Westin Hotel-Copley Place bills provided no breakdown of expenses, and that the Netherland Plaza bills were totally illegible.

The PLCC has provided documentation for some of these lodging expenses. The Court has considered these newly-submitted documents and finds that some expenses incurred at these hotels are still questionable without further explanation and must therefore be denied. The expenses which will be denied will be set forth with particularity below.

As for the Rodeway Inn expenses, folios showing the breakdown of expenses have now been provided, and the $2,000.00 overpayment cited by the Magistrate has been confirmed by the Court. The PLCC requests reimbursement of this overpayment and states that the PLCC will pursue any claim for the $2,000.00 against the Rodeway Inn. The Court finds that the expenses shown by the Rodeway Inn folios are reasonable and proper; the Court, however, has determined that the PLCC should not be reimbursed for its $2,000.00 overpayment. The PLCC can pursue its claim against the Rodeway Inn for the overpayment without further involvement of the plaintiffs' fund. Therefore, the PLCC should be reimbursed in the amount of $17,787.74 for expenses incurred at the Rodeway Inn.

As to the Westin Hotel-Copley Place, folios showing the breakdown of expenses totalling $2,797.71 have now been provided. Brook Semple's bill of $316.67 and Carl Duncan's bill of $323.05 are reasonable and proper and should now be allowed. The Court finds some of the expenses of Mssrs. Stan Chesley and William Hillman cannot be allowed without further explanation: the expenses which will be disallowed are identified below by invoice entry number, date, description, and amount.

| Mr. Chesley's bill | | | | |
|---|---|---|---|---|
| | | | | $1,533.82 |
| #34 | 11/30/84 | Turners | | −244.02 |
| #45 | " " | guest rm. dining | | 99.60 |

12. This sum reflects the correction of Mr. Hillman's addition; his sum claimed was $100.00 less.

| | | | |
|---|---|---|---:|
| #55 | " " | lobby lounge | $ 16.69 |
| #56 | " " | lobby lounge | 16.69 |
| #57 | " " | Banquets Cont. breakfast | 185.50 |
| #60 | 12/1/84 | Brasserie | 28.36 |
| | | TOTAL DISALLOWED: | $ 590.86 |
| | | TOTAL ALLOWED: | $ 942.96 |
| **Mr. Hillman's bill** | | | $ 538.82 |
| # 1 | 11/29/84 | Ten Huntington | –14.40 |
| # 3 | 11/30/84 | lobby lounge | 13.13 |
| # 7 | " " | Ten Huntington | 186.96 |
| #10 | 12/1/84 | lobby lounge | 31.78 |
| | | TOTAL DISALLOWED: | $ 246.27 |
| | | TOTAL ALLOWED: | $ 292.55 |

Thus of the $2,797.71 which the PLCC requested as reimbursement of expenses at the Westin Hotel, the PLCC shall recover the amount of $1,875.23.

As to the Netherland Plaza, folios have now been provided which show the breakdown of expenses. The PLCC has requested reimbursement of $2,444.25 for expenses incurred at the Netherland Plaza. The following expenses, which are described as the foregoing were, will be disallowed:

| | | | |
|---|---|---|---:|
| **Mr. Duncan's bill** | | (for 12/20–22/84) | $ 445.85 |
| # 7 | 12/20/84 | Palm Court lounge | –17.77 |
| # 8 | " " | Cafe Restaurant | 53.15 |
| #32 | 12/21/84 | Palm Court lounge | 29.27 |
| #33 | " " | Palm Court lounge | 100.46 |
| | | TOTAL DISALLOWED: | $ 200.65 |
| | | TOTAL ALLOWED: | $ 245.20 |
| **Mr. Duncan's bill** | | (for 12/15–17/84) | $ 322.55 |
| # 2 | 12/15/84 | Cafe Restaurant | –51.41 |
| # 9 | 12/16/84 | Palm Court lounge | 8.33 |
| #11 | " " | Cafe Restaurant | 48.57 |
| | | TOTAL DISALLOWED: | $ 108.31 |
| | | TOTAL ALLOWED: | $ 214.22 |
| **Mr. Duncan's bill** | | (for 12/1–7/84) | $1,004.04 |
| # 3 | 12/1/84 | Cafe Restaurant | –102.00 |
| # 5 | " " | Cafe Restaurant | 271.33 |
| #11 | 12/2/84 | Palm Court lounge | 15.00 |
| #19 | 12/4/84 | Palm Court lounge | 9.91 |
| #20 | " " | Palm Court lounge | 27.53 |
| #28 | 12/5/84 | Palm Court lounge | 11.50 |
| #29 | " " | Palm Court lounge | 6.00 |
| | | TOTAL DISALLOWED: | $ 443.27 |
| | | TOTAL ALLOWED: | $ 560.77 |
| **Mr. Duncan's bill** | | (for 1/25–27/85) | $ 185.28 |
| # 2 | 1/25/85 | Palm Court lounge | –22.00 |
| #10 | 1/26/85 | Palm Court lounge | 3.90 |
| | | TOTAL DISALLOWED: | $ 25.90 |
| | | TOTAL ALLOWED: | $ 159.38 |
| **Mr. Duncan's bill** | | (for 2/19–22/85) | $ 486.53 |
| # 1 | 2/19/85 | Palm Court lounge | –22.67 |
| #10 | 2/20/85 | Palm Court lounge | 8.33 |
| #16 | 2/21/85 | Orchids Restaurant | 162.10 |
| | | TOTAL DISALLOWED: | $ 193.10 |
| | | TOTAL ALLOWED: | $ 293.43 |

Thus, the PLCC should be reimbursed $1,473.00 for expenses incurred at the Netherland Plaza. The total of disallowed expenses incurred at the Netherland Plaza is $971.23.

### (3) *Out-of-Pocket Expenses*

The Magistrate broke this heading down into claims. In *Claim 1* the PLCC original-ly claimed $2,406.26; this sum reflects the correction of Mr. Hillman's addition. The Magistrate recommended allowing $1,507.57 to the PLCC for expenses which were then documented. The PLCC has now documented an additional $543.53, which should be allowed:

| | | |
|---|---|---:|
| 12/17/84 | Bostonian Hotel | $ 281.25 |
| 12/19/84 | Balcony Restaurant | $ 87.93 |
| 12/20/84 | Americana Inn | 92.33 * |
| " " | Americana Inn | 82.02 |
| | TOTAL ALLOWED: | $ 543.53 |

\* Lounge bill totalling $35.79 disallowed.

The out-of-pocket expenses disallowed are as follows:

| | | |
|---|---|---:|
| 10/31/84 | Ramada Inn/Hertz Car Rental | $110.77 |
| 12/17/84 | Bostonian Hotel "Seasons" | $130.39 |
| 12/20/84 | Americana Inn (lounge) | $ 35.79 |
| 1/12/85 | Helmsley Palace (phone calls and theatre tickets disallowed by the Magistrate) | $ 78.19 |
| | TOTAL DISALLOWED: | $355.14 |

*Claim 2* No additional documentation has been provided for the Americana Inn expenses totalling $75.06 which the Magistrate recommended disallowing. Thus, the PLCC should be reimbursed $298.00 for Claim 2 as recommended by the Magistrate.

*Claim 3* has now been fully documented; therefore, the PLCC should be reimbursed for the entire amount claimed of $839.88. Since the Magistrate recommended allowing $114.95, which was the amount previously documented, the PLCC will be entitled to recover an additional $724.93.

### (4) *Unpaid Expenses*

The PLCC did not request reconsideration of the Magistrate's recommendation that only $101,781.74 of the $104,821.72 which the PLCC claimed should be awarded. Therefore, the PLCC should be awarded $101,781.74.

In conclusion, in Category A the PLCC shall be entitled to reimbursement for the following expenses in addition to the amounts recommended by the Magistrate:

| | |
|---|---:|
| Hotels | 17,787.74 |
| | 1,875.23 |
| | 1,266.78 |
| Out-of-Pocket | 543.53 |
| | 298.00 |
| | 724.93 |
| TOTAL ALLOWED: | $22,496.21 |

### CATEGORY B

In Category B, which concerns the Beverly Hills expenses as borne by the firm of Waite, Schneider, Bayless, and Chesley, the PLCC claimed $80,501.89; the Magistrate, however, recommended allowing only $68,-397.41, which were the documented expenses as of December 5, 1985. In the motion for reconsideration of the report and recommendation, the PLCC addresses only four headings in Category B. The Court will address each of these headings separately.

### (1) *Travel Expenses*

Under this heading, the PLCC claimed $6,766.88, but only $5,842.32 of these expenses were documented as of December 5, 1985. The PLCC has subsequently documented the entire bill of $540.37 incurred by Mr. Rabourn at the Hotel Inter-Continental in New York. The Magistrate recommended allowing only the $86.95 portion previously documented. Accordingly, the PLCC will be reimbursed for the additional $453.42.

Also, the PLCC has now explained that the meals at Steak & Ale on April 21, 1985,

the Depot on June 6, 1985, and at Tony's Restaurant on June 28, 1985, were shared by four, five, and seven persons connected with the litigation respectively. The PLCC will be reimbursed for these three meals totalling $377.64.

### (2) *Out-of-Pocket Expenses*

Under this heading, the PLCC originally claimed $8,645.00 which was to represent cash advances and reimbursements to Mr. Stan Chesley from April 17, 1984, through July 25, 1985. In the motion to reconsider, the PLCC acknowledges that this claim is undocumented except for some checks to Mr. Chesley, which have not been submitted to the Court. The PLCC in its motion to reconsider has amended its claim to suggest reimbursement in the amount of only $2,200.00, which is $50.00 for each of the pre-trial and trial days, to cover Mr. Chesley's out-of-pocket expenses on behalf of four or more people daily. The Court finds that since these expenses are undocumented they must be disallowed.

### (3) *Hotel Expenses*

The Magistrate noted that the PLCC claimed $3,228.53, but documented only $1,596.88 of the expenses under this heading. The PLCC seeks reconsideration of the Magistrate's recommendation to deny the $200.76 bill to the Maison Robert in Boston, and the $1,024.09 bill to the Bostonian Hotel. The PLCC has provided no additional documentation. The credit card receipt shows no breakdown of expenses. The PLCC states that it still seeks proper documentation. The Magistrate's recommendation will be adopted, and these two expenses will be disallowed.

### (4) *Telephone Expenses*

The Magistrate recommended disallowing the $400.00 *projected* telephone bill for September 1985. Since the *actual* bill has now been provided, the PLCC shall be reimbursed for the actual amount of $115.79.

## CATEGORY D

In the report and recommendation, the Magistrate recommended reimbursing Mr. Thomas Spraul only for his documented expense of $704.00 for his mileage. Mr. Spraul has subsequently provided adequate documentation for his lodging and phone bills which totalled $1,503.00. Mr. Spraul will be reimbursed for this additional $1,503.00.

## INTEREST

On April 29, 1986, the PLCC filed its supplemental motion for an award of expenses which seeks reimbursement of the $12,904.84 in interest paid by the PLCC on the $160,000.00 borrowed by the PLCC from the Fifth Third Bank of Cincinnati, Ohio, for the prosecution of this lawsuit. In his report and recommendation, the Magistrate recommended that the PLCC be reimbursed for these interest payments when the figure was calculated. The PLCC has now documented the interest charges and the payments. Therefore, the PLCC shall be reimbursed for the $12,904.84.

## FEES FOR EXPERT WITNESSES

On April 16, 1986, the PLCC filed a motion to supplement its application for an award of expenses. In support of said motion, the PLCC states that since the filing of the application for payment of expenses the PLCC has received numerous billings from various expert witnesses. The PLCC has attached documentation of these expenses to the motion to supplement.

The Court has reviewed the listing of expert witnesses and their billings and has determined that reimbursement of expenses for defendants John I. Paulding, Inc., Pass & Seymour, and Reynolds Metals has previously been authorized. Additionally, the Court has determined that the amounts requested for the expenses of John Sharry and Bernard Beland are incorrect and should be increased to reflect their final billings which are $3,685.08 and $2,496.10 respectively. [See Defense Group's response filed 1/27/86]. Finally, the PLCC still denies having agreed with the defendants to divide the cost of the defendants' "wall" exhibit, and the defend-

ants have not shown in the record any basis for requiring the PLCC to share this expense.

Accordingly, the PLCC's motion to supplement its application for payment of expenses is SUSTAINED. Since the Court has by separate orders authorized direct payment to various defendants for their expenses incurred incident to the testimony of their expert witnesses, the PLCC shall *not* be reimbursed for the expenses of John I. Paulding, Inc. (now known as Bedford Assets Corporation), Pass & Seymour, and Reynolds Metals.

The PLCC shall not be required to pay for half of the set-up expenses of the defendants' "wall" exhibit.

The PLCC's requests for reimbursement of the remainder of the expenses addressed by this motion are SUSTAINED. The PLCC shall be reimbursed for the following expenses for expert witnesses:

| a. | The expenses of Martin Fay | $ 600.00 |
| b. | The expenses of Roger Landers | 2,324.70 |
| c. | The expenses of John Sharry | 3,685.08 |
| d. | The expenses of Bernard Beland | 2,496.10 |
| e. | The expenses of Paul Cilwa | 270.00 |
| f. | The expenses of Francis Gelzheiser | 935.00 |
| g. | The expenses of Terry Hoyle | 2,065.08 |
| | TOTAL: | $12,375.96 |

In summary, the Magistrate recommended reimbursing the PLCC in the amount of $302,946.48 for expenses in categories A, B, C, and D. Inasmuch as the Court finds that the Magistrate's report and recommendation is substantially justified and supported by the record, it shall be adopted as the basis for the Court's decision with the following three exceptions.

The PLCC has subsequently documented an additional $24,946.06 of the expenses which the Magistrate recommended denying simply due to the failure of the PLCC to provide adequate documentation. Also, the PLCC has obtained the calculation and proper documentation of its interest payments on the loan at the Fifth Third Bank, and shall be reimbursed for interest payments totalling $12,904.84. For expert witnesses expenses borne by the PLCC, the PLCC shall be reimbursed for the amount of $11,440.96. Therefore, the total amount of these expenses which have been documented since the Magistrate's report and recommendation and for which the PLCC shall be reimbursed is $49,291.86.

Therefore, the Court finds and awards the PLCC the sum of $352,057.71 as reimbursement of the expenses it incurred in the prosecution of this litigation. The payment of this sum is broken down as follows:

Category A (Pay to PLCC):
| Recommended Amount | $233,664.44 |
| Supplemental Amount | +22,496.21 |
| Interest on loan | 12,904.84 |
| Expert Witnesses' Fees | 12,375.96 |
| TOTAL: | $281,441.45 |

Category B (Pay to Firm of Waite, Schneider, Bayless, and Chesley):
| Recommended Amount | $ 68,397.41 |
| Supplemental Amount | 946.85 |
| TOTAL: | $ 69,334.26 |

Category C (Pay to William Hillman)
| Recommended Amount | $ 180.63 |

Category D (Pay to Thomas Spraul)
| Recommended Amount | $ 704.00 |
| Supplemental Amount | $ 1,503.00 |
| TOTAL: | $ 2,207.00 |

Category E (The firm of Keating, Meuthing and Klekamp claimed no expenses.)

It should be noted that these expenses totalling $353,163.34 amounts to only 2.49% of the total $14,150,000.00 settlements. These expenses are within acceptable limits.

## CONCLUSION

Although substantial sums of money have and will be distributed to individuals and families touched by this terrible tragedy, it could never be sufficient to replace the losses that have occurred. It is only the best that we can possibly do.

The attorneys that have represented these parties are to be highly commended for their tireless efforts.